1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT ALAN DANIEL, et al.,

                    Plaintiffs,

         v.

UNITED STATES OF AMERICA,

                    Defendant.

Case No. 3:22-cv-05303-TMC

ORDER ON MOTION TO DISMISS

In this action brought under the Federal Tort Claims Act (FTCA), Plaintiffs allege that an excavator accident on a Forest Service Road injuring Plaintiff Robert Daniel was caused by the negligence of the United States Forest Service. Defendant United States of America has moved to dismiss Daniel's claims based on the discretionary function exception to the FTCA. Dkt. 17. Although some of Daniel's negligence allegations are barred by that exception, one allegation— that the Forest Service allowed logging to begin over the stretch of road where Daniel's accident occurred despite the contractor pointing out that an eroded shoulder made the road unsafe— depends on the resolution of disputed facts intertwined with the merits, and those disputes must be resolved at trial. *See Young v. United States*, 769 F.3d 1047, 1052–53 (9th Cir. 2014). Taking the evidence in the light most favorable to Daniel, the Forest Service's decision to allow logging

over the road without repairing the shoulder is not covered by the discretionary function exception. The motion to dismiss is therefore GRANTED in part and DENIED in part.

## I.    BACKGROUND

On March 7, 2020, Daniel was driving an excavator on Forest Service Road 47 ("FR 47") in the Gifford Pinchot National Forest (GPNF) when his excavator slid off the road, tumbled downhill, and rolled once before stopping, injuring Daniel. Dkt. 1 ¶¶ 3.21–.22. Daniel was working for NW Renewable Energy Group, LLC (doing business as Arsiero Logging, or "Arsiero"), a timber broker logging company holding a contract with the United States Forest Service. *Id.* ¶ 3.24; Dkt. 28-4 at 5. On May 3, 2022, Daniel, along with his adult daughter Hanna Sue Daniel, and on behalf of his minor children JRD and LJD, brought this negligence action against the United States under the FTCA. Dkt. 1 ¶¶ 2.1–2.3.

## A.    Development of GPNF Annual Road Maintenance Plans

The Forest Service develops annual road maintenance plans which set forth and prioritize the roadwork to be completed in the GPNF each year. *See* Dkt. 18-4, 18-5. Although the plan establishes a list of prioritized roads and projects, the plan "is fluid [and] must be adaptable when issues or needs emerge throughout the year." Dkt. 19 ¶ 8. The annual plans "vest GPNF employees with discretion to perform general road maintenance on Level 2 roads 'as needed,'" *id.* ¶ 10; *see also* Dkt. 18-5 at 23, and they allow road crews to respond to emergencies, Dkt. 18-4 at 3.

As explained by GPNF District Engineer Sarah Rockey, "[p]riority is determined based on factors such as safety, road condition, anticipated and historical road use, road surface, and availability of funding for road projects." Dkt. 19 ¶ 7. Decisions to perform roadwork on a given road depend on "the size and location of the project, the current and expected weather conditions, any potential environmental impacts, the various methods of repair, and the

availability of equipment, materials, and staff to perform the maintenance or reconstruction." *Id.* ¶ 8. GPNF employees "must also balance any competing safety considerations for employees to complete the maintenance or reconstruction with the safety of the public." *Id.*

Rockey testified that the 2019 and 2020 plans prioritized Level 3 to 5 roads, followed by Level 2 roads that access popular campgrounds, trailheads, and administrative sites. *Id.* ¶ 10; *see also* Dkt. 18-4 at 6. She testified that in developing these two plans, she "balanced numerous competing policy considerations that implicate concerns about the environment, public access and safety, resource allocation, topography, and preservation of natural and cultural resources." Dkt. 19 ¶ 19.

**B.      Willie Thin Offer and Reoffer**

Road maintenance on Forest Service roads is also performed by logging companies as part of timber sale contracts. In 2019, the Forest Service published an offer for a timber sale in the GPNF called the "Willie Thin SBA offer." Dkt. 18-6 at 2. After receiving no bids, the Forest Service modified the offer and published it as the "Willie Thin SBA reoffer." Dkt. 18-7 at 4; Dkt. 18-8 at 2. In the reoffer, the Forest Service removed about 25 to 30 acres of timber thinning, reorganized the haul route, changed from a measurement sale to a scale sale (which places less financial risk on the purchaser), and decreased the price of the timber. Dkt. 18-7 at 33–34; Dkt. 28-1 at 33.

Timber sale contractors use Forest Service roads to access and haul timber. Dkt. 19 ¶ 13. The roads "often require some reconstruction and maintenance before hauling operations can begin to make them ready for 'safe haul.' Safe haul is based on the prescription guidelines for a maintenance Level 2 road." *Id.* On a Level 2 road in a timber contract, safe haul requires "twelve feet width of traveled roadway for high clearance vehicles." Dkt. 19 ¶ 13. A slump (where the ground at the edge of the road is eroding downhill, which the parties also refer to as an "eroded

shoulder") is not "considered a part of the usable width" but "[u]sable width may be reduced to 10 feet in the area of the slump." Dkt. 19 ¶ 14. The reoffer required 12 feet of width of traveled way and included this exception. Dkt. 18-8 at 115–16. On a Level 2 road, maintenance to the shoulder "is not required unless necessary to maintain the structural integrity of the roadway, drainage functionality, or access by high-clearance vehicles." Dkt. 18-2 at 33.

The Willie Thin reoffer altered the road reconstruction package (a set of roadwork projects the contractor must perform before beginning hauling operations). *See* Dkt. 19 ¶ 15. Among other changes, the reoffer omitted a requirement in the offer that the contractor grind the asphalt of a 2.29-mile section of FR 47 from milepost ("MP") 13.68 to 15.97. *Compare* Dkt. 28-15 at 120 *with* Dkt. 18-8 at 64. This section included the site of Daniel's accident at MP 14.4.[1] *See* Dkt. 28-5 at 41. Forest Service Contracting Officer Mary Bresee, testifying as a designee of the United States under Federal Rule of Civil Procedure 30(b)(6), explained that the Forest Service removed this requirement after determining that asphalt grinding was a National Environmental Policy Act ("NEPA") requirement, rather than a safe haul requirement, and thus unnecessary for the road reconstruction package. Dkt. 28-1 at 33–34, 45–46.

The reoffer also omitted a term in the offer requiring the contractor to repair the shoulder for the same 2.29-mile section. Dkt. 28-15 at 120. Brian Michael Malgarini, the owner-operator of Arsiero, testified in his deposition that this term would have required his team to repair the shoulder at MP 14.4. Dkt. 28-5 at 41. Bresee explained that the Forest Service omitted some of the original reconstruction requirements because they were on roads serving areas no longer

---

[1] According to discussion in GPNF District Engineer Sarah Rockey's deposition, some documents in the record may refer to the site of Daniel's accident with a different number. *See* Dkt. 28-2. For clarity, the Court refers to this site as MP 14.4.

ORDER ON MOTION TO DISMISS - 4

included in the sale; the Forest Service omitted other requirements based on a determination of what safe haul required. Dkt. 28-1 at 48.

Arsiero bid on the reoffer and entered a timber sale contract with the Forest Service. Dkt. 18-8 at 9.

**C.      Road reconstruction work and design changes**

Arsiero performed road reconstruction according to the contract terms. But the reconstruction package changed in part after the contract was signed. Dkt. 28-5 at 37. As Rockey explained in her deposition, the package can change because during the contract, "we could have a weather event or another hazard might come up," so we "work with the purchaser," and "[i]f there's a safety concern, we could add that to [the reconstruction package]." Dkt. 18-3 at 35. Rockey added that making the road safe for haul must be addressed; in her words, "anything for safe haul." *Id.* at 25. Bresee, the contracting officer, agreed that "for road reconstruction, we have to have it safe for haul." Dkt. 28-1 at 26.

The contract for the Willie Thin reoffer also reflects these principles. The contract specifies that "Design Changes" may be made "due to differences between anticipated and actual field conditions," that such changes shall "[b]e necessary to assure stability of specified roads," and that the "Forest Service shall revise Plans and specifications as necessary to meet new conditions." Dkt. 18-8 at 34. The contract further provides that "[i]n the event that Contracting Officer identifies a conflict between the requirements of this contract . . . and State or Federal safety requirements, the contract shall be modified and Purchaser may request an adjustment in Current Contract Rates to compensate for the changed conditions." Dkt. 18-8 at 38.

In preparation for hauling on the Willie Thin reoffer, although they were not included in the original reconstruction package, Arsiero repaired about one hundred feet of road at MP 13.58 and the shoulder at MP 12.2 on FR 47, which slumped close to the wheel track. Dkt. 28-4 at 41.

Malgarini testified in his deposition that Arsiero saved money on roadwork on a section of Forest Service Road 85 and reallocated those funds to these projects at MP 13.58 and 12.2. Dkt. 28-4 at 111; Dkt. 28-5 at 38–39. He sought and received the Forest Service's approval to reallocate the funds to repair MP 12.2 as a no-cost design change to the contract. Dkt. 18-3 at 16–17. Rockey explained that although the road at MP 12.2 "had enough lane width . . . , [the slump] was close to the wheel line . . . . [Malgarini] had requested that [repair], and I agreed that it should be fixed for safety." Dkt. 18-3 at 17. An email from Rockey further described: "Purchaser was concerned about this site as was I, this site was dropped from the original Bromo package. It is a narrow section of road with vertical failure close to the wheel track." Dkt. 28-7 at 1.

D.      **Concerns about MP 14.4**

Malgarini testified that in addition to MP 12.2, he had also raised safety concerns about MP 14.4—the site of Daniel's accident—to Forest Service representative Ronelle Goens[2] and Rockey: "We did our checklist of the things we had to repair on [FR] 47 and the other roads. And before we got the final to go ahead and haul, we brought those areas up and said, 'I can't believe we're getting the okay to haul past these points.'" Dkt. 28-4 at 14. He clarified that although he raised concerns before hauling began, he did not request to repair MP 14.4 until later; he could not recall whether he made that repair request before or after Daniel's accident. Dkt. 28-5 at 6–7. He explained the Forest Service officers said they omitted the MP 12.2 and 14.4 repairs from the reoffer because "in order to sell the timber sale they had to lower the road package, and [MP 12.2 and 14.4 is] what they chose to throw out." Dkt. 28-4 at 16. Malgarini said that in his experience in the timber sale business, "a situation like that would have been fixed, but . . . [i]t's the Forest Service call and they said, 'we're not going to fix them.'" Dkt. 28-

---

[2] Ronelle Goens has passed away since Daniel's accident. Dkt. 28-4 at 45.

4 at 14; *id.* at 27 ("I was told it was dropped out of the package, didn't have the money to fix it, so that's why it was the way it is."). Malgarini believed that MP 14.4 was just as unsafe as MP 12.2. *Id.* at 54.

The Forest Service disputes this fact. Rockey testified that Malgarini expressed concerns about MP 12.2 only, Dkt. 28-2 at 67, and that she recalls no one raising concerns as to MP 14.4:

> If they were hauling prior to the accident, and even after the accident, without a repair, it was not a safety concern. There was no mention of anybody having a concern for safety at that site; not the purchaser, not me, not the [Forest Service Representative], not the [Contracting Officer], not even the employees. I do not recall anybody saying that they had a concern for safety at that site.

Dkt. 28-2 at 24. Whether Rockey or Malgarini is correct, Rockey ultimately approved hauling over FR 47 without repairing the eroded shoulder at MP 14.4, and the Forest Service did not authorize payment for that repair until after Daniel's accident.

## II.   DISCUSSION

### A.   Legal Standard

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). When, as here, the Court responds to factual attacks on subject matter jurisdiction, plaintiffs "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (alteration in original) (quoting *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

1
2
3
4
5
6

The Court "may look beyond the pleadings to the parties' evidence without converting the motion to dismiss into one for summary judgment." *Edison*, 822 F.3d at 517 (citing *White v. Lee*, 277 F.3d 1214, 1242 (9th Cir. 2000)). When "evaluating the evidence, the court 'need not presume the truthfulness of the plaintiffs' allegations.'" *Id.* (quoting *White*, 277 F.3d at 1242). "Any factual disputes, however, must be resolved in favor of Plaintiffs." *Id.* (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)).

7

**B.      Discretionary Function Immunity**

8
9
10
11
12
13
14

Under the FTCA, the United States waived its sovereign immunity by granting district courts jurisdiction over "civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of a government employee "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

15
16
17
18
19
20
21
22
23
24

The FTCA contains several exceptions to the federal government's waiver of immunity, including the discretionary function exception. 28 U.S.C. § 2680. The United States argues that the discretionary function exception preserves its sovereign immunity as to the claims here. Dkt. 17 at 10. The United States is immune from suit under the discretionary function exception for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency" or a government employee, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception applies even if the government agent was negligent in his or her duties, so long as those duties were discretionary. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

The United States bears the burden of proving the applicability of the discretionary function exception. *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

Courts apply a "'two-step test to determine whether the discretionary function exception' applies." *Schurg v. United States*, 63 F.4th 826, 831 (9th Cir. 2023), *cert. denied sub nom. O'Grady v. United States*, 144 S. Ct. 379 (2023); *see United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 535–37 (1988). "Courts must determine whether (1) 'the challenged actions involve an "element of judgment or choice"' and, if so, whether (2) the 'judgment is of the kind that the discretionary function exception was designed to shield.'" *Schurg*, 63 F.4th at 831 (quoting *Esquivel v. United States*, 21 F.4th 565, 573–74 (9th Cir. 2021)). If the challenged action satisfies both steps, the discretionary function exception applies, and federal courts lack subject matter jurisdiction over the claims. *Id.*

### 1.    *Alleged Wrongdoing*

"Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014) (citing *GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1174 (9th Cir. 2002)). The Court thus must "identify Plaintiffs' 'specific allegations of agency wrongdoing'" before applying the two-step test. *Id.* (citing *Berkovitz*, 486 U.S. at 540). "To identify the particular agency conduct with which Plaintiffs take issue, [courts] look to the allegations of Plaintiffs' complaint." *Id.* (citing *Whisnant*, 400 F.3d at 1184–85). Here, because the parties have already completed fact discovery and the United States has made a factual attack on jurisdiction, Plaintiffs have submitted evidence to support and refine the allegations in the complaint.

Plaintiffs allege in their complaint that "Defendant United States failed to exercise ordinary care in the design, construction, maintenance and/or repair of FS 47 at milepost 14.4 to

keep it reasonably safe for ordinary travel." Dkt. 1 ¶ 4.1. Plaintiffs contend that three factors within the Forest Service's control "converged to cause Mr. Daniel's injury": (1) the road's nine percent superelevation rate (the slope of the road towards the inside edge of the curve); (2) the asphalt surface; and (3) the eroded shoulder.[3] Dkt. 27 at 31; *see also* Dkt. 1 ¶¶ 3.13–3.14. Plaintiffs allege the Forest Service negligently failed to remedy these factors at four decision points: (1) designing the road with a nine percent superelevation rate at MP 14.4; (2) omitting asphalt grinding and shoulder repair of MP 14.4 from the GPNF Annual Road Maintenance Plans; (3) omitting asphalt grinding and shoulder repair of MP 14.4 from the Willie Thin reoffer road reconstruction package despite including it in the original offer; and (4) determining FR 47 was safe for haul despite Malgarini's comments about MP 14.4 and the Forest Service's approval of the similar MP 12.2 shoulder repair. *See* Dkt. 1 ¶¶ 3.13; 3.25; Dkt. 27 at 32–34. The Court considers these four decision points to be the "specific allegations of agency wrongdoing" at issue. *See Young*, 769 F.3d at 1053.

### 2.    Step 1:  Element of Judgment or Choice

A challenged action satisfies the first step of the discretionary function test where no "federal statute, regulation, or policy mandated a specific course of action," and the government employee "retained an element of judgment or choice with respect to carrying out the challenged action." *Schurg*, 63 F.4th at 831 (quoting *Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011)). Where a statute, regulation, or policy specifically prescribes the challenged action, the action fails the first step, because "there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'" *Esquivel*, 21 F.4th at 573 (quoting *Berkovitz*, 486 U.S. at 536). "An agency must exercise judgment or choice where no statute or agency

---

[3] Plaintiffs at first alleged negligence for failure to clear the culvert at MP 14.4, Dkt. 1 ¶¶ 3.9–3.17, but confirmed at oral argument that they have withdrawn this claim after discovery.

policy dictates the precise manner in which the agency is to complete the challenged task."
*Schurg*, 63 F.4th at 833 (quoting *Green*, 630 F.3d at 1250). "If a statute or policy directs
'mandatory and specific action,' however, there can be no element of choice." *Id.* (quoting
*Terbush*, 516 F.3d at 1129).

 The United States has met its burden of showing that no policy mandates a specific
course of action by identifying applicable provisions of the Forest Service Manual and Forest
Service Handbook, as well as the Guidelines for Road Maintenance Levels and the 2019 and
2020 GPNF Annual Road Maintenance Plans. *See* Dkt. 17 at 11–15. The Court agrees with the
United States that none of these provisions mandate a specific action applicable to Daniel's
claims. *See Ball v. United States*, No. C17-5056RBL, 2018 WL 4095084 (W.D. Wash. Aug. 28,
2018). Plaintiffs have not identified a statute, regulation, or policy to refute this showing, and the
Court finds none.

 Plaintiffs argue that "the United States cannot identify a judgment or choice to construct
FR 47 at MP 14.4 with a 9% superelevation in violation of its own design criteria." Dkt. 27 at 32.
But there is no statute, regulation, or policy that mandates this specific action. The Forest Service
Handbook chapter on Road Preconstruction recommends:

> Superelevation is an important consideration on level of service G and H roads.
> Superelevation is usually not important on level of service I and J roads, where user
> comfort, convenience, and speed of travel are generally not management
> considerations and road use can be restricted.

> To the extent practicable, avoid using superelevation for design speeds of less than
> 20 miles per hour. Where there is a possibility of encountering snow and ice, the
> superelevation rate should not exceed 6 percent and should be reduced further on
> grades to accommodate slow truck traffic.

Dkt. 28-18 at 38. A Level 2 road most closely corresponds to an I or J road and thus
"[s]uperelevation is usually not important." *Id.; see id.* at 10. It is also unclear when FR 47 was

designed and constructed, and Plaintiffs have not shown whether any superelevation guidelines were effective at that time.

Plaintiffs do not appear to contend that any statute, regulation, or policy mandates a specific action relevant to the other three decisions. *See* Dkt. 27 at 32–35. Accordingly, all decisions at issue are discretionary under step one.

3.      *Step 2: Public Policy*

If there is an element of judgment or choice, courts proceed to the second step and consider "whether the government actor's action or inaction was 'based on considerations of public policy,' which are 'the kind that the discretionary function exception was designed to shield.'" *Schurg*, 63 F.4th at 831 (quoting *Green*, 630 F.3d at 1249). "The pertinent question at the second step of the discretionary function exception test is whether [the relevant decisions] were based on 'social, economic, and political policy.'" *Id.* at 833 (quoting *Esquivel*, 21 F.4th at 574). "The challenged decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Id.* at 834 (quoting *Green*, 630 F.3d at 1251). Plaintiffs "bear the burden of showing there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Id.* at 831–32 (internal quotations omitted).

a)      ***The decision to design the road at MP 14.4 with a nine percent superelevation rate is susceptible to policy analysis.***

Plaintiffs contend that the United States was negligent to design FR 47 with a nine percent superelevation rate at MP 14.4. Dkt. 27 at 32. This is a design decision susceptible to policy analysis. The Ninth Circuit has "generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Whisnant*, 400 F.3d at 1181. The Ninth Circuit

has applied this holding to road design specifically. *See, e.g.*, *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) (holding decision to design a national park road without guardrails was grounded in policy considerations but road maintenance decision was not); *Kennewick*, 880 F.2d at 1027–28, 1031 (holding that absent deviation from mandatory and specific design guidelines, decisions on canal design were susceptible to policy analysis, but canal construction decision was not). Accordingly, the design decision on the superelevation of FR 47 at MP 14.4 was susceptible to economic, environmental, and other policy considerations, and thus falls under the discretionary function exception. That the United States has not identified when the Forest Service built the road does not alter this holding.

>       b)       ***Decisions on whether to include asphalt grinding and shoulder repair at MP 14.4 in GPNF Annual Road Maintenance Plans are susceptible to policy analysis.***

The Court next considers whether decisions about the contents of GPNF's annual road maintenance plans are susceptible to policy analysis.[4] GPNF is tasked with developing an annual road maintenance plan each year by Forest Service Manual ("FSM") 7730. Dkt. 18-4 at 24–25. FSM 7730 provides that annual plans should:

>       a.   Encompass both short-term and long-term needs;
>       b.   Develop and include bridge maintenance plans in the road maintenance plan (FSM 7736.44);
>       c.   Consider all sources of maintenance funding available during the fiscal year, including appropriated funds and deposits made by cooperators;

---

[4] Plaintiffs allege specifically that the Forest Service was negligent in failing to repair MP 14.4 as part of routine maintenance. *See* Dkt. 1 ¶ 3.15; Dkt. 17 at 34. The record shows that the Forest Service made decisions regarding routine maintenance through the annual road maintenance plans. *See* Dkt. 18-4, 18-5. Plaintiffs do not allege that the Forest Service negligently implemented such a plan or specify any other point at which the allegedly negligent routine maintenance decisions occurred. Accordingly, the Court examines the applicability of the discretionary function exception to decisions regarding the contents of GPNF's annual road maintenance plans.

> d. Consider maintenance performance by commercial haulers, Forest Service contractors (including timber purchasers), and cooperators; and
>
> e. Consider the need to expend appropriated road maintenance funds for road decommissioning, if such expenditures are authorized in annual appropriations bills (FSM 7734.01, para. 2).

*Id.* Where there is insufficient funding for annual road maintenance, the Forest Service must "allocate available funds in order of priority established in road maintenance plans." *Id.* at 25.

In 2019 and 2020, there were more Forest Service roads in GPNF than could be maintained; developing the GPNF annual plans thus involved prioritizing roads and projects. Dkt. 18-4 at 7; Dkt. 18-5 at 7. Rockey testified that the annual road maintenance plans set forth the Forest Service's maintenance priorities based on multiple factors such as "safety, road condition, anticipated and historical road use, road surface, and availability of funding for road projects." Dkt. 19 at 7. In developing the 2019 and 2020 plans for GPNF, she said she balanced considerations including "the environment, public access and safety, resource allocation, topography, and preservation of natural and cultural resources." Dkt. 19 ¶ 19. The 2019 and 2020 GPNF Annual Road Maintenance Plans prioritized Level 3 to 5 roads, followed by the most popular Level 2 roads. Dkt. 19 ¶ 10.

Decisions about the roads to include and prioritize in an annual plan are susceptible to policy analysis. Rather than repairing possibly larger hazards on less trafficked Level 2 roads, the Forest Service prioritizes maintaining roads that receive the most public traffic and are designated to serve standard passenger cars with greater concern for user comfort, convenience, and safety. *See* Dkt. 18-5 at 20–25.

Under FSM 7730, the Forest Service must consider "both short-term and long-term needs" as well as maintenance performed by other entities and available sources of maintenance funding. Because a regulation granted the Forest Service discretion to consider policy concerns,

the discretionary function exception applies. *Childers v. United States*, 40 F.3d 973, 974 n.1 (9th Cir. 1994), *as amended* (Jan. 17, 1995) ("The application of the exception does not depend . . . on whether federal officials actually took public policy considerations into account. All that is required is that the applicable statute or regulation gave the government agent discretion to take policy goals into account."). That the Forest Service developed the annual plans within budgetary constraints does not negate its balancing of other policy considerations. "[W]here a statute or policy plainly requires the government to balance expense against other desiderata, then considering the cost of greater safety is a discretionary function." *Nat'l Fire Union Insurance v. United States*, 115 F.3d 1415, 1421–22 (9th Cir. 1997). FSM 7730 directs the Forest Service to "allocate available funds in order of priority established in road maintenance plans." *Id.* at 25. Accordingly, the United States has met its burden of showing that its decisions about the GPNF Annual Road Maintenance Plans were susceptible to policy considerations.

> c)   ***Decision to omit asphalt grinding and shoulder repair from Willie Thin reoffer road reconstruction package is susceptible to policy analysis.***

Next, the Court considers whether decisions on what to include in the road reconstruction package of a timber sale contract are susceptible to policy analysis. Road reconstruction packages in timber sale contracts "identify[] the projects the purchaser must perform prior to hauling operations." Dkt. 19 ¶ 15. Roads used for logging operations "are typically primitive, remote roads that have been damaged by weather events and often require some reconstruction and maintenance before hauling operations can begin to make them ready for 'safe haul[,]'" which "is based on the prescription guidelines for a maintenance Level 2 road." *Id.* ¶ 13.

FSM 2400 addresses timber management, *see* Dkt. 18-17, 18-18, and provides that the Forest Service must "[s]elect, design, and implement timber project-level activities in an economically efficient manner, consistent with the objectives and guidance of the forest plan,"

Dkt. 18-7 at 8. The code instructs Forest Service employees not to "select alternative courses of action primarily because of the greatest dollar return or the greatest unit output, but seek to ensure that total benefits equal or exceed total costs over time." *Id.* at 9. It also instructs them to consider the interaction of timber management projects with other resource concerns:

> 1. Prepare and administer forest management program activities to meet the resource management objectives expressed in the forest plan.

> 2. Use the standards and guidelines in the forest plan to integrate needs for and protection of associated natural resources during project design and administration.

> 3. Use the timber sale program and other forest management activities to enhance timber and other forest resource values and benefits over time. The timber sale program can provide substantial fish and wildlife habitat improvement, road building with attendant recreation access, and improved timber stand productivity; decrease hazardous fuels and associated risks of catastrophic wildfire, improve forest health, and increase water yields; and it can also improve many other resources.

> 4. Recognize that forest management may also adversely affect these resources, and carry out these activities in a manner that minimizes adverse effects.

*Id.*

In commercial timber sales specifically, the code provides for a project analysis and design process, the purpose of which "is to develop an environmentally sound and cost-efficient project under the [NEPA] provisions and to develop a design for field layout of the project." Dkt. 18-18 at 13. As part of this process, Forest Service employees must "[e]valuate each proposed road construction or reconstruction project to determine the least-cost facility (considering cost of construction, maintenance, and hauling) for the sale." *Id.* at 14. They must also conduct "a financial and, if necessary, economic analysis," as well as an environmental analysis. *Id.* at 15.

Once this analysis and design stage is complete, Forest Service employees are to implement the sale project design using "the direction provided during the environmental analysis and decision-making process." *Id.* at 16. They are tasked with, among other items,

"[d]esign[ing] roads to be constructed on National Forest System lands to standards appropriate for their intended uses, considering safety, cost of transportation, and impacts on lands and resources, and traffic that will use the road during the sale." *Id.* at 18. They must "identify and plan the development and use of both specified and temporary roads and provide for road management objectives (FSM 7710)," and "[p]lan all roads prior to the sale according to FSM 7710." *Id.*

FSM 7710 provides that the Forest Service must "[d]etermine the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of NFS lands, using science-based travel analysis" while "consider[ing] and minimiz[ing] effects of transportation facility construction, reconstruction, maintenance, and decommissioning on heritage resources, ecological processes, and ecosystem health, diversity, and productivity." Dkt. 18-13 at 6.

Rockey testified in her declaration that "[r]oad reconstruction authorized under a timber sale contract must be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources" and "consistent with the maintenance level assigned to the road." *Id.* ¶ 16. She testified that when creating road reconstruction packages, she "balance[s] numerous competing policy considerations that implicate concerns about the environment, public access and safety, resource allocation, topography, and preservation of natural and cultural resources." *Id.* ¶ 19. She noted that she considered all these factors when developing the Willie Thin reoffer road reconstruction package. *Id.*

Bresee explained why the Forest Service altered the original road reconstruction package in the Willie Thin reoffer. She said the Forest Service omitted some of the original road reconstruction requirements because they were on roads serving areas no longer included in the sale; other requirements were omitted from the reoffer based on Rockey and the Forest Service

Engineer's determination of what safe haul required. Dkt. 28-1 at 48. She also noted that the Forest Service removed the asphalt grinding requirement because it determined it was a NEPA requirement rather than a safe haul requirement. *Id.* at 33–34.

Bresee's explanation of the changes to the road reconstruction package might suggest that the decision to omit reconstruction at MP 14.4 was rooted in technical analysis and not one the discretionary function exception is designed to shield. *See Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1214 (9th Cir. 2001). Even so, "[t]he challenged decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Schurg*, 63 F.4th at 834 (quoting *Green*, 630 F.3d at 1251). Moreover, "[t]he application of the exception does not depend . . . on whether federal officials actually took public policy considerations into account. All that is required is that the applicable statute or regulation gave the government agent discretion to take policy goals into account." *Childers*, 40 F.3d at 974 n.1 (citing *Gaubert*, 499 U.S. at 324–25). The FSM 2400 and 7710 regulations give Forest Service employees the discretion to decide on road reconstruction in timber sale contracts with consideration for environmental, natural resource preservation, land impact, economic, and other policy concerns. Decisions about what to include in road reconstruction packages in timber sale contracts are susceptible to policy analysis.

Plaintiffs contend that this decision was budgetary and thus not susceptible to policy analysis. Dkt. 27 at 9. They cite Malgarini's testimony stating he was told that repairs at MP 12.2 and 14.4 "were dropped from the [road reconstruction] package . . . because the cost." *Id.* at 13 (quoting Dkt. 28-4 at 16). But in *National Fire Union Insurance*, the Ninth Circuit held:

> [W]hether the government can take cost into account depends on the applicable statutes, regulations, and policies . . . . Where a statute or policy requires a particular government action, it has no discretionary function immunity based on its choice to spend its money doing something else instead. But where a statute or policy

plainly requires the government to balance expense against other desiderata, then considering the cost of greater safety is a discretionary function.

115 F.3d at 1421–22. FSM 2400 repeatedly directs the Forest Service to consider cost, Dkt. 18-17 at 9; Dkt. 18-18 at 18, prioritize cost-efficiency, Dkt. 18-17 at 8; Dkt. 18-18 at 10, 13, and select the "least-cost" option within certain parameters, Dkt. 18-18 at 14, 19. Accordingly, "considering the cost of greater safety" of including roadwork at MP 14.4 in the road reconstruction package is a discretionary function susceptible to policy analysis. *See Nat'l Fire*, 115 F.3d at 1422.

> **d)** **Decision to allow hauling over MP 14.4 after learning of specific danger is not susceptible to policy analysis.**

The Court next considers Daniel's final contention: that the Forest Service was negligent when it failed to authorize reconstruction of the eroded shoulder and allowed hauling over MP 14.4 after Malgarini, the timber contractor, pointed out that it was not safe to haul over that portion of the road. Daniel contends that the eroded shoulder at MP 14.4 was just as dangerous as the eroded shoulder at MP 12.2, which the Forest Service agreed needed to be repaired. But as Malgarini testified, unlike MP 12.2, repairing the shoulder at MP 14.4 would have required additional cost.

As discussed above, *see* Section II.B.1, although "the question of *whether* the government was negligent is irrelevant to the applicability of the discretionary function exception," *Whisnant*, 400 F.3d at 1185, "the question of *how* the government was negligent is 'critical' to the discretionary function exception inquiry," *Young*, 769 F.3d at 1054. Here, there are two aspects to how Daniel contends the United States was negligent: first, the decision not to repair MP 14.4 after Malgarini pointed out that it was dangerous, and second, the decision to approve hauling to begin on the road without that repair. Neither decision is susceptible to policy analysis.

First, the testimony of the United States' witnesses and 30(b)(6) designee, along with the provisions of the timber sale contract, establish that if a road condition arises that makes the road unsafe for haul, the Forest Service is supposed to modify the contract to allow for reconstruction. Unlike the decision of what road reconstruction to include in the initial timber sale contract, which is susceptible to balancing public policy concerns, the decision whether to approve a specific repair once the danger is known is more like a routine maintenance decision or the implementation of an existing safety measure, to which discretionary function immunity does not apply. *See, e.g.*, *Marlys Bear Med.*, 241 F.3d at 1215 ("The Government cannot claim that both the decision to take safety measures and the negligent implementation of those measures are protected policy decisions."); *Routh v. United States*, 941 F.2d 853, 856 (9th Cir. 1991) ("[T]he contracting officer's decision whether or not a given situation created a safety hazard in violation of the safety provisions of the contract was not a public policy decision."); *ARA Leisure Servs*, 831 F.2d at 195 ("Where the challenged governmental activity involves safety considerations under an established policy . . . the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees.").

Second, the undisputed evidence submitted by the parties also establishes that once reconstruction work on a timber sale contract begins, the Forest Service must inspect the project and determine the roads are safe for haul before hauling can begin. *See, e.g.*, Dkt. 28-6 (letter from Bresee authorizing haul over FR 47); Dkt. 19 ¶ 15 (declaration from Sarah Rockey that Forest Service representatives work with the purchasers "to inspect the road and determine the necessary reconstruction for safe haul."). Bresee, the contracting officer, testified in her capacity as a 30(b)(6) designee that the road engineers are "the expert[s] in the determination of safe haul." Dkt. 28-1 at 28. To make that determination, the road engineers rely on the guidelines for the corresponding maintenance level of the road, *see* Dkt. 19 ¶ 13, Forest Service manuals, *see*

Dkt. 28-2 at 24, the terms of the contract itself, *see id.*, and their own professional expertise about what "should be fixed for safety," *id.* at 22.

The Ninth Circuit has held "that actions based on technical or scientific standards are not the kind of judgments meant to be protected from liability by the discretionary function exception because those actions do not involve a weighing of policy considerations." *Marlys Bear Med.*, 241 F.3d at 1214; *see also Whisnant*, 400 F.3d at 1181 ("[M]atters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy.") It has clarified that generally, "once the Government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception. The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not." *Marlys Bear Med.*, 241 F.3d at 1214.

Here again, although the Forest Service's earlier decision about what reconstruction to require as part of the initial timber sale contract may be susceptible to policy analysis, the specific decision to sign off on haul over a particular road once the contract was undertaken is not. Bresee and Rockey's testimony shows that the Forest Service relies on engineers to make the safe haul decision based on an application of technical safety standards in the Forest Service Manual, the Forest Service Handbook, and the Willie Thin reoffer contract. And the decision is one implementing these safety standards, rather than adopting them. Accordingly, it is not the type of decision the discretionary function exception is meant to protect. *See id.*

The United States and Daniel disagree as a factual matter whether Malgarini ever raised a safety concern about MP 14.4 before Daniel's accident. In some cases, on a motion to dismiss for lack of subject matter jurisdiction, "the court may hear evidence of those facts and resolve factual disputes when necessary." *Young*, 769 F.3d at 1052 (cleaned up). But "where the

jurisdictional issue and the substantive issue are so intertwined that the question of jurisdiction is dependent on factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Id.* at 1052–53 (quoting *Augustine*, 704 F.2d at 1077). In this case, the competing testimony from Malgarini and Rockey is so intertwined with the merits that it should not be resolved on a jurisdictional motion. *See id.* at 1053, 1059 n.2 (holding that where parties disputed whether National Park Service knew of latent hazard, and knowledge would prevent application of discretionary function exception, question of jurisdiction must await determination on the merits).

### III.    CONCLUSION

For the reasons explained above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss for lack of subject matter jurisdiction (Dkt. 17). The Court hereby ORDERS:

- The motion is GRANTED as to claims regarding Defendant's decisions to (1) design the road with a nine percent superelevation rate at MP 14.4; (2) omit asphalt grinding and shoulder repair of MP 14.4 from the GPNF Annual Maintenance Plans; and (3) omit asphalt grinding and shoulder repair of MP 14.4 from the Willie Thin reoffer road reconstruction package despite including it in the original offer. These decisions are covered by the discretionary function exception.

- The motion is DENIED as to claims regarding Defendant's decision not to repair MP 14.4 after learning of the eroded shoulder and Defendant's determination that FR 47 was safe for haul. These decisions are not protected by the discretionary function exception.

- The parties must confer and file a joint status report within 14 days from the filing of this order proposing a schedule for the remaining deadlines and informing the Court when this case will be ready for trial. For any dates on which counsel is unavailable for trial, they must provide detailed information about the nature of their conflict.

Dated this 2nd day of April, 2024.

Tiffany M. Cartwright
United States District Judge