UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ROBERT ALAN DANIEL, et al.,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 3:22-cv-05303-TMC<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## I. INTRODUCTION

On May 3, 2022, Plaintiffs Robert Alan Daniel (individually and on behalf of his minor child J.R.D.), Hanna Sue Daniel, and Logan Jerry Daniel filed a complaint against Defendant United States of America. Dkt. 1. Plaintiffs allege that the negligence of the United States Forest Service ("Forest Service") caused Robert Daniel injury when his excavator slid off Forest Service Road (FR) 47 while he was working on a logging contract. The Court heard this matter in a bench trial on liability only that began testimony on June 29, 2026 and concluded testimony on July 2, 2026, with closing arguments on July 13, 2026.

After orders on the parties' motions to dismiss and for summary judgment (Dkt. 42, 68) and a limited remand from the U.S. Court of Appeals for the Ninth Circuit (Dkt. 79), the remaining issues for trial on Plaintiffs' negligence claim were: (1) whether the Forest Service

owed Daniel a duty to make the land safe for entry, or whether it had delegated that duty through the timber sale contract to Daniel's employer, Arsiero Logging; (2) whether the danger of the eroded shoulder at milepost 14.4 of FR 47 was known and obvious to Daniel, including whether the superelevation of the curve made the danger less obvious; (3) whether the Forest Service should have foreseen that Daniel would choose to encounter the risk of the eroded shoulder despite its known or obvious nature; and (4) whether the failure to repair the eroded shoulder caused Daniel's injuries. The United States also asserted affirmative defenses of contributory negligence and assumption of risk. The parties submitted proposed findings of fact and conclusions of law. Dkt. 120, 121.

Having heard the testimony, reviewed the admitted exhibits and deposition designations, and reviewed the parties' briefing, the Court makes the following findings of fact and conclusions of law by a preponderance of the evidence, pursuant to Federal Rule of Civil Procedure 52. While some findings cite trial exhibits or portions of testimony that were particularly important, all the findings and conclusions below are based upon the Court's consideration of all the admissible evidence and the Court's assessment of the credibility of the trial witnesses. Any conclusion of law denominated as a finding of fact shall be deemed a conclusion of law, and any finding of fact denominated as a conclusion of law shall be deemed a finding of fact.

## II. FINDINGS OF FACT

### A. Background

1. Robert Daniel was injured on March 17, 2020, while operating an excavator on FR 47 near milepost 14.4 in the Gifford Pinchot National Forest. The parties used the phrase "walking the excavator" to refer to driving the excavator along the road.

2. At the time of his injury, Mr. Daniel was employed by Northwest Renewable Energy, LLC (doing business as Arsiero Logging, or "Arsiero"), which was operating under a logging contract known as the Willie Thin Reoffer.

3. The Forest Service received four SF-95 administrative claims for Plaintiffs on October 21, 2021.

4. Plaintiffs filed this action on May 3, 2022—more than six months after the filing of their SF-95 administrative claims.

**B. The Missing Shoulder at Milepost 14.4 of FR 47**

5. FR 47 is a Level 2 road as defined by Forest Service Guidelines for Road Maintenance Levels.

6. FR 47 was constructed on steep terrain.

7. At milepost 14.4 of FR 47, the road curves around a steep gully. A stream culvert passes under the road at the curve. *See* Ex. 13; Ex. 16; Ex. 18.

8. The superelevation at the curve of milepost 14.4 is approximately 9 percent. *See* Ex. 27; Ex. 28.

9. At some unknown point in time before the entry of the Willie Thin Reoffer contract, the culvert became clogged, and water passing over the roadway eroded the shoulder on the inside of the curve. *See* Trial Tr. 151:5–10; 152:10–19.

10. The shoulder at that point was entirely eroded and undermined the asphalt road. *See* Ex. 18; Ex. 20; Trial Tr. 158:1–20; 166:5–14.

11. The damage to the shoulder and the roadway predated the Willie Thin Reoffer contract and was not a changing roadway condition that arose during the contract.

**C. The "Willie Thin Reoffer" Timber Sale Contract**

12. The Forest Service is authorized to sell trees, portions of trees, and other forest products located on National Forest System lands, such as the Gifford Pinchot National Forest.

13. Timber sale purchasers, their employees, and subcontractors use Forest Service roads when conducting logging operations. These roads often require reconstruction or maintenance before hauling operations begin so the roads are ready for "safe haul."

14. Timber sale contracts include road reconstruction packages identifying reconstruction work the purchaser must perform before hauling operations begin, pursuant to 36 C.F.R. § 223.47(a).

15. The Forest Service awarded the Willie Thin Reoffer contract to Arsiero Logging on September 11, 2019.

16. The contract delegated responsibility to Arsiero for regular road maintenance, but not for road reconstruction. *See* Trial Tr. 24:20–25:4.

17. Road reconstruction required the approval of the Forest Service. *See* Trial Tr. 23:13–16; 24:20–25:4; 139:24–140:5.

18. During contract performance, Arsiero identified a separate location on FR 47 at milepost 12.2 that was not included in the original road reconstruction package but presented a safety concern because of vertical roadway failure near the wheel track. *See* Ex. 519 at 4–5; Trial Tr. 18:24–22:9.

19. After inspecting the location, the Forest Service agreed with Arsiero's assessment and modified the contract to reallocate funding to repair that location at milepost 12.2. The design change resulted in a "no-cost" design change. *See* Ex. 519 at 4; Trial Tr. 18:24–22:23; 29:10–15.

20. The erosion and undermining of FR 47 at milepost 14.4 presented a safety risk and level of damage to the road that was equal to or greater than the location at milepost 12.2. *See* Ex. 519; Ex. 503; Trial Tr. 160:13–161:2.

21. The preexisting superelevation of the road made the eroded shoulder at milepost 14.4 more dangerous. *See* Trial Tr. 145:1–148:23; 237:2–12.

22. Repair of the shoulder at milepost 14.4 of FR 47 fell into the category of road reconstruction, not regular maintenance.

23. Repair of the shoulder at milepost 14.4 of FR 47 was not included in the reconstruction package for the Willie Thin Reoffer. Authorizing that repair remained the responsibility of the Forest Service.

24. After Arsiero completed most of the road reconstruction work that was included in the package, the Forest Service approved Arsiero and its subcontractors to begin hauling timber, including "winter haul," in October 2019. *See* Ex. 11.

25. The shoulder at milepost 14.4 of FR 47 was not repaired by either Arsiero or the Forest Service before Daniel's accident on March 17, 2020.

26. Arsiero hauled logs on FR 47 between October 2019 and March 2020.

27. During that time, no one from Arsiero expressly requested that the Forest Service repair or grant Arsiero permission to repair the eroded shoulder at milepost 14.4.

28. Throughout that time, however, Forest Service employee Ronelle Goens was often physically present on FR 47 and had actual and constructive notice of the eroded shoulder. *See* Trial Tr. 153:16–154:15.

29. Arsiero employees also discussed the danger presented by the shoulder with Goens, even if they did not expressly request permission to repair it. *See* Trial Tr. 331:18–332:9; 353:11–20.

30. Throughout that time, both Arsiero's employees and Goens as a representative of the Forest Service were aware of the eroded shoulder at milepost 14.4 and that it posed a danger to the logging crew.

31. Goens and other employees of the Forest Service understood that the regular job duties of Daniel and other members of Arsiero's logging crew included driving over FR 47 in both wheeled and tracked vehicles, sometimes in winter conditions with snow and ice on the roadway. *See* Ex. 11; Ex. 12 at 006051, 006054; Ex. 516 at 2, 6, 9, 10, 23; Trial Tr. at 12:1–4; 149:12–151:4; 316:10–317:19.

**D. The Accident**

32. On the morning of March 17, 2020, Daniel was using a grader to clear snow farther up FR 47. This was within the scope of his employment and a typical job duty to open the road for ongoing logging operations. *See* Trial Tr. 356:8–358:14; 550:21–552:24.

33. When the grader became stuck, Daniel went to get an excavator to pull it out of the snow. *See* Ex. 516 at 7.

34. Daniel reasonably believed that retrieving the grader was a necessary part of his job duties, and using the excavator was the best option available to him.

35. Daniel has worked in the logging industry since approximately age sixteen. *See* Trial Tr. 347:21–22.

36. Daniel has extensive experience as a logger and three to four years of experience operating excavators, including in snowy and icy conditions. *See* Trial Tr. 347:23–348:18; 349:19–350:4.

37. To retrieve the grader, Daniel had to "walk" the excavator up FR 47 past milepost 14.4. On that morning, this portion of FR 47 had some combination of frost, snow, and/or ice over the asphalt. *See* Ex. 13; Ex. 516 at 8.

38. Daniel was familiar with the conditions at milepost 14.4, including the condition of the shoulder. He had traversed that portion of FR 47 many times.

39. Daniel also knew that tracked vehicles such as an excavator can lose traction on snow and ice.

40. Although Daniel did not know the degree of superelevation of the roadway around milepost 14.4, he was aware that the road was "banked" such that it sloped toward the eroded shoulder.

41. Daniel, Malgarini, and other employees of Arsiero working on FR 47 were aware that milepost 14.4 was a particularly dangerous location but believed they could safely navigate it if they exercised caution.

42. As he approached milepost 14.4, Daniel maneuvered the excavator to the far side of the road away from the eroded shoulder. He did this both to give himself greater distance from the eroded shoulder and to place the right track of the excavator on the opposite shoulder for greater traction. *See* Ex. 13; Trial Tr. 325:15–23; 373:22–374:21; 547:12–548:8.

43. Daniel exercised reasonable care both in operating the excavator and navigating the road at milepost 14.4.

44. Despite those efforts, as Daniel went around the curve at milepost 14.4, the opposite shoulder narrowed where the culvert passed under the road (*see* Ex. 18; Ex. 503; Ex. 47 at 3), and Daniel steered both excavator tracks onto the asphalt. Due to the icy conditions and the slope of the roadway, the excavator began sliding across the road toward the gully. *See* Trial Tr. 447:5–450:5.

45. Daniel attempted to stop the slide by lowering the excavator boom but was unable to arrest the movement.

46. The excavator left the roadway, rolled once down the embankment, and came to rest on its tracks. *See* Ex. 13; Ex. 20; Ex. 34; Ex. 36; Ex. 46 at 4.

47. Daniel was injured in the accident.

48. In late April 2020, the shoulder was repaired. *See* Ex. 33; Ex. 516 at 4. The repaired shoulder had a usable width at the accident site of approximately 8 feet. *See* Ex. 46 at 7; Trial Tr. 436:2–17.

49. There was contradictory evidence at trial as to whether the Forest Service approved the repair at the accident site. *See* Ex. 516 at 4; Trial Tr. 48:24–49:5; 141:3–12; 142:22–24; 276:13–21. The Court ultimately finds by the preponderance of the evidence that the testimony of Mary Bresee and the similar discussion of the two different repairs along FR 47 in the Timber Sale Inspection Report dated April 29, 2020 (Ex. 516 at 4), with reference to the same provision B5.2 of the timber sale contract (*see* Ex. 513 at 30), shows that they were both approved.

50. That the Forest Service approved the repair before it proceeded, and the reference in the inspection report to the same provision B5.2 for both repairs—a section of the contract that primarily covers construction, not maintenance—further supports the Court's earlier finding that repairing the eroded shoulder at milepost 14.4 was road reconstruction, not maintenance. *See also* Trial Tr. 102:16–103:2; 106:16–107:3; 156:4–10.

51. That haul continued over FR 47 at both milepost 12.2 and 14.4 until both shoulders were repaired (even after the Forest Service acknowledged the safety concern at milepost 12.2 in writing) also further supports that the Forest Service anticipated the loggers would encounter the danger in performance of their regular job duties.

**E. Causation**

52. Both Plaintiffs' expert, Mr. McCort, and Defendant's expert, Mr. Toglia, agreed that the coefficient of friction between the excavator's steel tracks and the snow and ice conditions present on FR 47 was between 0.03 and 0.06. *See* Ex. 46 at 6–7; Trial Tr. 452:5–19, 454:15–455:3; 613:14–614:16; 621:18–622:17.

53. McCort and Toglia agreed that Daniel's excavator was likely sliding sideways on the icy asphalt on March 17, 2020 at a speed of 3 to 4 miles per hour. Ex. 46 at 7; Ex. 501a at 8; Trial Tr. 494:1–11; 610:18–22.

54. McCort and Toglia agreed that the weight of the excavator was approximately 40,000 pounds. *See* Ex. 46 at 3; Ex. 501a at 2; Trial Tr. 608:12–23.

55. Assuming a but-for world where the eroded shoulder had been repaired to a width of 8 feet before the accident, McCort testified that a coefficient of friction of approximately 0.18 would have been necessary on the shoulder to arrest the excavator's slide. *See* Ex. 46 at 8. Toglia agreed that 0.18 would have been required.

56. McCort testified that because the shoulder would have consisted of dirt and gravel, rather than asphalt, it was more likely than not that the friction of that surface, as well as the mechanical engagement from the excavator's tracks with the dirt, would have produced the necessary coefficient of friction to stop the slide. *See* Ex. 46 at 8, 11; Trial Tr. 456:1–462:22; 495:11–22. The Court credits this testimony.

57. In weighing the testimony of the experts, the Court ultimately found McCort more persuasive as to whether the presence of an 8-foot shoulder would have prevented the accident.

58. The preponderance of the evidence shows that but for the missing shoulder at milepost 14.4, Daniel's excavator would not have slid off the road into the gully.

## III. CONCLUSIONS OF LAW

### A. Negligence Under the Federal Tort Claims Act (FTCA)

1. Plaintiffs assert a claim of negligence against the United States under the FTCA.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b).

3. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402(b) because Daniel resides in this judicial district.

4. Under the FTCA, the United States is liable for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

5. Washington law governs the substance of this matter because the events occurred within Washington state. 28 U.S.C. § 1346(b)(1); *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citing *Richards v. United States*, 369 U.S. 1, 7 (1962)) (applying California law in FTCA case because events at issue occurred in California).

6. Plaintiffs bear the burden of proving each element of their negligence claim by a preponderance of the evidence. To establish the elements of a negligence claim, the plaintiffs must prove "(1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury." *Tincani v. Inland Empire Zoo. Soc.*, 124 Wn.2d 121, 127–28, 875 P.2d 621 (1994).

7. "In premises liability actions, a person's status, based on the common law classifications of persons entering upon real property (invitee, licensee, or trespasser), determines the scope of the duty of care owed by the possessor (owner or occupier) of that property." *Id.* at 128.

8. Employees of Arsiero Logging, including Daniel, were business invitees of the Forest Service while working within the scope of their duties on the contract between the Forest Service and Arsiero. *Eylander v. Prologis Targeted U.S. Logistics Fund*, 2 Wn.3d 401, 407, 539 P.3d 376 (2023) ("It is well settled that an independent contractor's employees are considered invitees on a landowner's premises.").

9. To define a landowner's duties to a business invitee, Washington has adopted the Restatement (Second) of Torts, sections 343 and 343A. *Iwai v. Wash. Emp. Sec. Dep't*, 129 Wn.2d 84, 95, 915 P.2d 1089 (1996).

10. Under section 343, a landowner is liable for physical harm to their invitees caused by a condition on the land if the landowner "(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees"; "(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it"; and "(c) fails to exercise reasonable care to protect them against the danger." *Eylander*, 2 Wn.3d at 408. "In short, a landowner owes an invitee a duty of reasonable care to make the land safe for entry." *Id.*

11. The United States knew of the eroded shoulder at milepost 14.4 of FR 47 and knew that it involved an unreasonable risk of harm to the logging crew, including Daniel. Although the reasonable expectation of safety on a logging road differs from that on a road used for passenger travel, the degree of erosion and undermining of the road on a curve with a steep superelevation and a sharp drop-off posed an unreasonable risk of harm for the job duties required to carry out the logging contract.

12. The United States has argued that even if it had notice of the danger at milepost 14.4, it is not liable for harm caused by that dangerous condition because the danger was open and obvious to Arsiero's employees, including Daniel.

13. The Court agrees that the danger at milepost 14.4 was open and obvious. While Daniel may not have known the precise superelevation of the curve, he knew that the curve was banked, and that the bank of the curve combined with the eroded shoulder and the steep gully made that location particularly dangerous. The open and obvious nature of that danger is why Daniel steered the excavator along the far side of the curve and sought to keep one track on the upper shoulder.

14. But in Washington, a landowner is liable for harm brought about by a dangerous condition on the land, notwithstanding the known or obvious danger of the condition, when "the possessor should anticipate the harm despite such knowledge or obviousness." *Iwai*, 915 P.2d at 1093 (quoting Restatement (Second) of Torts § 343A (1965)).

15. This includes when "the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the risk," such as "when the only alternative to taking the risk [is] to forgo [] employment." Restatement (Second) of Torts §§ 343A cmt. F, illus. 5.

16. The United States had reason to expect that Arsiero's employees, including Daniel, would reasonably believe that the advantages of fulfilling their job duties on FR 47 outweighed the risk of navigating the eroded shoulder at milepost 14.4. *See Iwai*, 129 Wn.2d at 95 ("Persons desperately seeking employment can be expected to brave the elements to check for job postings at Employment Security's facilities.").

17. The United States has also argued that it fulfilled its duty to make the land safe for Arsiero's employees by delegating that duty to Arsiero as an independent contractor. *See Eylander*, 2 Wn.3d at 415 ("[A] landowner may satisfy its duty to guard the invitee against

known or obvious dangers on the premises by delegating the duty of protection to an independent contractor.”).

18. But the Forest Service did not delegate its duty to make the land safe for entry to Arsiero Logging.

19. Under Washington law, a delegation of a landowner’s duties toward invitees is valid if it “is explicit in nature and the scope requires the independent contractor to assume the duty of exercising reasonable care to make the land safe for entry, meaning the delegation anticipates the harm of known or obvious dangers.” *Id.*

20. While the Forest Service delegated certain maintenance duties to Arsiero, and Arsiero was responsible for ensuring safety in its own operations, the Forest Service did not delegate its duty to make or authorize repairs to its roads that required reconstruction. Arsiero was not responsible for dangers arising from preexisting disrepair of the roads for which reconstruction had not been authorized, such as the eroded shoulder at milepost 14.4.

21. Nor did the Forest Service delegate its duty to identify preexisting hazards on its roads.

22. For these reasons, it was not Arsiero’s responsibility to expressly request permission to repair the eroded shoulder at milepost 14.4 of FR 47 when the Forest Service had actual notice of the danger.

23. The Court therefore concludes that the Forest Service had a duty to repair the eroded shoulder at milepost 14.4 to make the land safe for entry, that it did not delegate this duty to Arsiero, and that this duty persisted despite the open and obvious nature of the danger.

24. The Forest Service breached that duty by not repairing the shoulder or directing Arsiero to due so within a reasonable time after it had actual notice of the dangerous condition.

25. Daniel was injured when his excavator slid off the eroded shoulder.

26. The failure to repair the shoulder was a proximate cause of Daniel's injury because had a shoulder been present, it would have arrested the slide of the excavator before it fell into the gully.

27. Daniel exercised reasonable care when operating the excavator and was not contributorily negligent.

**B. Assumption of Risk**

28. The United States has also argued that Daniel's recovery should be barred under the doctrine of implied primary assumption of risk.

29. "Implied *primary* assumption of risk arises where a plaintiff has impliedly consented (often in advance of any negligence by defendant) to relieve defendant of a duty to plaintiff regarding specific *known* and appreciated risks." *Scott v. Pac. West Mt. Resort*, 119 Wn.2d 484, 497, 834 P.2d 6 (1992).

30. "A classic example of primary assumption of risk occurs in sports cases. One who participates in sports 'assumes the risks' which are *inherent in the sport*." *Id.* at 498. "A defendant simply does not have a duty to protect a sports participant from dangers which are an inherent and normal part of a sport." *Id.*

31. The United States did not prove that Daniel impliedly assumed the risk created by the eroded shoulder. While it is true that logging is a risky profession, the United States did not prove that the risk created by the failure of the Forest Service to repair a dangerous road condition was an "inherent and normal" part of logging. *Scott*, 119 Wn.2d at 498; *see also Kirk v. WSU*, 109 Wn.2d 448, 457,746 P.2d 285 (1987) (while plaintiff assumed the risks inherent in the sport of cheerleading, she did not assume the risks caused by the university's provision of dangerous facilities).

32. The Forest Service is therefore liable to Daniel for the injuries caused in the accident on March 17, 2020.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that the United States is liable to Daniel for his injuries. The parties previously agreed to bifurcate discovery and trial on damages until after a finding of liability. The parties are therefore ordered to provide a joint status report within 14 days of this Order proposing a schedule for the remainder of the case.

Dated this 25th day of August, 2026.

Tiffany M. Cartwright
United States District Judge